# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

BARBARA FORD, Individually and as                                                PLAINTIFF
Personal Representative of the ESTATE OF
JOE FORD, and on Behalf of Joe Ford's
Wrongful Death Beneficiaries

v.                                       No. 4:08CV00176 JLH

UNITED STATES OF AMERICA                                              DEFENDANT

## OPINION AND ORDER

This is a medical malpractice case brought against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, alleging that the negligence of a VA doctor resulted in the death of Joe Ford, who committed suicide by means of a self-inflicted gunshot wound to the head on October 7, 2004.[1] Joe Ford had been seen by a staff psychiatrist, Dr. Shelley J. Brown, at the Central Arkansas Veterans' Healthcare System on September 27, 2004. Barbara Ford contends that Dr. Shelley Brown was negligent in failing to perform a thorough and complete evaluation of Joe Ford in order to assess adequately the suicide risk and in failing to provide proper treatment and care of Joe Ford in accordance with such an evaluation. Barbara Ford contends that Dr. Shelley Brown failed to evaluate a recent gun purchase by Joe Ford with sufficient thoroughness, failed to diagnose adequately the imminence of the suicide risk, and failed to provide proper treatment by confiscating the gun or seeking to admit Joe Ford for inpatient care immediately.

The evidence has been presented at a bench trial, and the parties have filed post-trial briefs, so this case is ripe for decision. For the reasons stated hereinafter, the Court finds that the evaluation

---

[1] The certificate of death states that Joe Ford was injured and pronounced dead on September 7, 2004, but it is undisputed that the actual date was October 7, 2004.

and treatment by Dr. Shelley Brown comported with the degree of skill and learning ordinarily possessed and used by psychiatrists in the Little Rock area or in similar metropolitan areas—she was not negligent.

**I.**

The United States is liable:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1) (2006). Thus, Congress has mandated that a federal court adjudicating a claim under the Federal Tort Claims Act must apply the law of the state where the act or omission occurred. *Richards v. United States*, 369 U.S. 1, 11, 82 S. Ct. 585, 592, 7 L. Ed. 2d 492 (1962).

The Arkansas law relating to medical malpractice is codified at sections 16-114-201 to -212 of the Arkansas Code. The plaintiff in a medical malpractice case has the burden of proving:

> (1) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant, the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality;
>
> (2) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant that the medical care provider failed to act in accordance with that standard; and
>
> (3) By means of expert testimony provided only by a qualified medical expert that as a proximate result thereof the injured person suffered injuries that would not otherwise have occurred.

Ark. Code Ann. § 16-114-206(a). In other words, the plaintiff must prove the applicable standard of care, that the medical provider failed to act in accordance with that standard, and that the failure

2

to do so was a proximate cause of the injuries. *Williamson v. Elrod*, 348 Ark. 307, 311, 72 S.W.3d 489, 492 (2002); *Dodd v. Sparks Regional Med. Ctr.*, 90 Ark. App. 191, 197, 204 S.W.3d 579, 583 (2005).

## II.

Joe Ford was sixty-three years old when he died on October 7, 2004. He had served in Vietnam in the 1960s and was seeking Veterans Administration benefits for post-traumatic stress disorder when he went to see Dr. Shelley Brown on September 27, 2004. It was his first and only visit to Dr. Brown. He had been seen on August 11, 2004, in the Central Arkansas Veterans Healthcare System primary care outpatient clinic, where he had been assessed as having cardiomyopathy, congestive heart failure, coronary artery disease, depression, post-traumatic stress disorder, and hypothyroidism. He was then referred to the psychiatric clinic for further evaluation. No claim is made that the primary care physician was negligent in any way; the only claim of negligence is made with respect to the conduct of Dr. Shelley Brown.

Before his one and only visit to Dr. Shelley Brown, Joe Ford had been treated by Dr. Winston Brown, a psychiatrist at the University of Arkansas Medical Center. The medical records introduced at trial indicate that Dr. Winston Brown first saw Joe Ford on July 18, 2000. Dr. Winston Brown continued to see Joe Ford over the next four years. Dr. Winston Brown initially stated that his impression was "major depressive disorder recurrent." He prescribed Wellbutrin and Effexor. At that first visit, Joe Ford reported that he was drinking two to three glasses of wine per night. As time passed, Dr. Winston Brown's records reflect more conversation about Joe Ford's drinking habits. Dr. Winston Brown eventually instructed Joe Ford to drink no more than two glasses of wine per day, and Joe Ford generally reported that he was complying with that directive.

3

The first report of suicidal thoughts appears in a record dated September 11, 2003. In his record for that day, Dr. Winston Brown reported that Joe Ford "says his depression continually worsens and he has developed suicidal ideation. In Joe, suicidal ideation is serious, but he says that he does not feel that it is threatening or he would take action upon his thoughts and plans." The record from that date also states:

> We had a serious discussion about his alcohol intake and he says he is drinking 4 to 5 glasses of wine per day. I discussed with him my longstanding concern about him and alcohol, which I voiced on many occasions, and the necessity for him to decrease his consumption and try to confine it to no more than 2 regular glasses of wine per day. I have asked him to communicate with me very clearly about suicidal ideation, so that we can get him better, protect him, and continue on an outpatient basis. He has my home telephone number and knows that I will be there off hours and on weekends if he needs, and he also has the UAMS emergency numbers.

On September 16, 2003, Dr. Winston Brown again saw Joe Ford and reported that Ford had improved. On September 23, 2003, Dr. Winston Brown saw Joe Ford and reported that he had not had suicidal ideation in the past week. On October 14, 2003, another record reports: "He came in today and said that the depression seems to be as bad as it has been in the past. Suicidal ideation is fleeting but not threatening and under control." Two days later, Joe Ford visited Dr. Winston Brown again, apparently to discuss the medications that he was on. The assessment reports:

> Joseph looks better today and does indeed seem less discouraged. Suicidal ideation is very well controlled and he seems encouraged by feeling better in the past few days. Alcohol consumption remains essentially the same.

A few days later Joe Ford fell and broke his clavicle. Dr. Winston Brown saw him again on November 10, 2003, and reported, "Joe looks better to me than he has in a long time, even though he has a fractured collarbone and he is on a little walker. . . . I think he is better than he has been,

and I have had a frank discussion with the two of them [Joe Ford and his wife, Barbara] about his drinking and its contribution."

On November 25, 2003, Joe Ford was again seen by Dr. Winston Brown, who reported, "Subjectively, he says he has not been doing much better, but objectively he [] certainly has a better appearance than he has [had] in the last couple of meetings." Dr. Winston Brown also reported:

> He smelled of alcohol today. When I inquired about his drinking habits, he said his wife was very observant and very sergeant-like and was keeping him controlled at 2 drinks per day as per my request.

On December 11, 2003, Dr. Winston Brown again saw Joe Ford and reported:

> He looks better each time he comes. He has a sense of humour. He has good eye contact looks. He looks relaxed. He says he is sleeping well.

In that record, Dr. Winston Brown again commented on Joe Ford's drinking stating: "He does admit that last week during the crises with his former wife and the child custody issue that he drank more."

The next record is from January 5, 2004, when Joe Ford saw Dr. Winston Brown. Dr. Brown's assessment was:

> He is neatly dressed and groomed this morning. He looks much more rested. He has a stronger voice and better eye contact. He has a sense of humor that is more keeping [sic] with him when he is well. In other words, he is able to see humor in his situation. There are no safety issues. He says that his appetite is getting somewhat better.

Dr. Winston Brown stated in his note that Joe Ford had reported that his wife was monitoring his alcohol consumption very closely and insisting that he not exceed two drinks per day.

Joe Ford's next visit to Dr. Winston Brown was six weeks later, on February 17, 2004. In his assessment, Dr. Brown wrote: "The patient ranks his mood as a 4 to 5 on a 10. Clinically, his

5

presentation is good." The plan was to continue the medications and "[s]ee me in three months, calling or coming earlier if needed."

Dr. Winston Brown saw Joe Ford approximately six weeks later, on April 1, 2004. The record states:

> There is no suicidal ideation, but other neurovegetative features of depression are present.
>
> When I inquired about drinking, he said he is drinking minimum of 4 drinks at night and recognizes that is self-defeating. In the past Barbara has been able to monitor that, but obviously her intervention is limited. Once again, I have suggested and recommended heartily that he cut his alcohol back because that is a problem for his health, especially for mood.

In his assessment, Dr. Winston Brown wrote:

> I have seen Joe appear more depressed than today; therefore, I am reluctant to take out Lexapro 20 mg. Certainly it is not doing everything we want, but my fear is taking it out would lead us to a worse state. Barbara asked if that might be causing greater difficulty, in other words increasing the depression, but I think not. I have asked him to try augmentation strategy by adding a small dose of desipramine.

The plan included a note that Joe Ford was to come back in one week. Again, Dr. Winston Brown recommended that Joe Ford curb his alcohol intake.

Joe Ford did not, apparently, come back in a week. The next record is dated June 15, 2004, regarding a telephone call from Barbara Ford in which she reported that Joe Ford had been denied VA benefits but was receiving Social Security disability. The record states:

> She says his depression remains significant. When I inquired about his alcohol intake, she says it is more than it should be, that there is little that can be done, and she understands that none of us can make that different.

Joe Ford next visited Dr. Winston Brown on August 26, 2004. The report states, "He was denied VA benefits, but has submitted an appeal." And:

6

> Joe reports that he continues to feel depressed, although the intensity is not as bad as what it has been in the past. He states the Ritalin is of tremendous help because when he awakens in the morning he feels pretty rough and rocky, and within 30 minutes feels much better with Ritalin.
>
> * * *
>
> He openly admits that he has done nothing to curb his intake of alcohol and justifies that on the fact that it gives him some relief in his discouragement about his condition and debilitated state.

In the assessment, Dr. Winston Brown wrote, "Joe does not look as depressed as he has in the past, which is some encouragement." In the plan, one of the comments states, "There are no suicidal ideations, and his mood was described as mildly depressed relative to what he has experienced in the past."

On September 10, 2004, in a telephone call Joe Ford reported that he was better after having discontinued Desipramine as directed on August 26 and his mood was okay. He was to increase the Lexapro and see Dr. Winston Brown again in two weeks.

Two weeks later, on September 24, 2004, Joe Ford saw Dr. Winston Brown for the last time. The assessment stated:

> The patient looks much better today than typically he does. He has a nice sense of humor, smiles, seems much more solid and secure than he has in the past. Just in general, a much brighter mood.
>
> His activities are generally at home with television, sports reading, newspaper reading. He continues to be anxious about money but that would be an anxiety-provoking topic. He will be going to the VA soon for an interview that is probably related to PTSD filing.

The plan was to continue the medication without change and "[s]ee me in the late winter or early spring."

# III.

Three days after his last visit with Dr. Winston Brown, Joe Ford saw Dr. Shelley Brown. He was accompanied by his wife, Barbara Ford. It would be the only time that Dr. Shelley Brown ever saw him or spoke with him. Part of the interview was conducted with Barbara Ford present and part of it with her absent. In the history of the present illness section of her report, Dr. Shelley Brown wrote:

> HPI: a 63-year-old, mwm veteran, not service connected, who presents to the VA for a transfer of care. He states he has applied for disability, as he is no longer able to cope with his nightmares. When he was younger, this was not as much of a problem, as he was active; he was a bank president before his medical retirement post-CABG w/ complications. His drinking has escalated since his retirement, although it was always significant, at least since Vietnam. The patient states he is "less able to hide," as he gets older. He has nightmares one to two times per week and daytime intrusive memories. When he awakens during the night, several times for one to two hours, he states he feels all right, but [ ] is sometime sweating. Accompanied by his wife today, she states his depression has been worse for the past two years.
>
> Predominant mood – depressed and irritable; his wife states he is always irritable and angry.
>
> SIGECAPS is broadly positive, with impaired sleep, although he is in bed from 9:00 p.m. until 8:00 a.m., there is poor continuity. Interest are [sic] reduced, and guilt is excessive with the patient feeling a sense of failure and helplessness. Energy and concentration are reduced and the patient feels worn out, although he is not sure how much of this is due to his heart problems. He also initially refuses to answer regarding suicidal fantasies or thoughts, but eventually stated he has no current plan or intent and will notify someone and seek help if these occur. The patient has basically stable weight, with an improved appetite since a change of a medicine to increased dose of Lexapro.
>
> PPH, the patient has been treated at UAMS by Dr. Winston Brown for the past four to five years. He has taken Effexor in the past. Wellbutrin made him more nervous, and he states he could not even speak for the hesitation during that period. It is unclear whether he has taken citalopram itself. He has not taken Prozac, Zoloft, BuSpar, Depakote, lithium, or carbamazepine. He has not taken trazodone, nor antipsychotics. He has had no inpatient hospitalization for alcohol dependence or depression, nor suicide attempts. He denies symptoms of psychosis, OCD, and

8

getting lost. He does complain of impaired short-term memory, and in addition to combat, he describes past traumas of hurricane and motor vehicle accidents without re-experiencing.

In her testimony, Dr. Shelley Brown stated that "SIGECAPS" is an acronym for the symptoms of depression. "S" is for sleep; "I" is for interest; "G" is for excessive guilt; "E" is for energy; "C" is for concentration; "A" is for appetite; "P" is for psychomotor retardation, slowing, agitation, or restlessness; and "S" is for suicidality. Dr. Shelley Brown testified that Joe Ford "endorsed basically all of SIGECAPS, the depressive symptoms. That's what broadly positive means."

Dr. Shelley Brown also recorded a social history, which included a report of Ford's upbringing, his education, his military service and the traumatic experiences that he encountered in Vietnam. She noted that he smoked a pack of cigarettes per day, had a conviction for driving under the influence of alcohol four years previously, and at the time she saw him, was drinking a bottle and a half of wine per day. She said, "He has lack of activity and motivation, general depression and irritability, and his drinking contributes to considerable marital strife; his wife essentially issues an ultimatum during this diagnostic interview today." Dr. Shelley Brown recorded that Joe Ford had "no psychotic symptoms; no homicidal ideation; frequent fantasies of self-harm, chronic and long-term." His mood was anxious. She recorded that his judgment and insight were adequate for outpatient treatment. "The patient does keep appointment[s], but has been grossly under-reporting his alcohol use to Dr. [Winston] Brown and he is reluctant to engage in active behavioral change." She noted that he was alert, fully oriented, and used language and objects appropriately.

Her impression was:

9

> This gentleman appears to have suffered from anxiety symptoms, which worsened with his medical retirement in about 2000, [secondary] to cardiac disease. The patient has long term excess use of alcohol, which likely impacts both his mood, and his physical health. He is seeking VA treatment as well as VA compensation for posttraumatic stress. He has significant marital distress. He is at a baseline of increased risk of self-harm due to his demographic factors, the lack of social support and isolation in his life, his physical health, his psychiatric disorders including substance abuse, and possibly other factors as well.

Dr. Shelley Brown gave a diagnosis of post-traumatic stress disorder and major depressive disorder versus depression secondary to alcohol dependence. In her plan, Dr. Shelley Brown wrote:

> The patient is [ ] without current plan or intent to harm himself or others, and does contract to contact help, should such occur. Dr. Winston Brown would be his first point of contact by his choice, although he is informed of the availability of this clinic, the Emergency Room and phone, police, or ambulance assistance. Therefore, the patient will be treated in the least restrictive treatment modality available, which is outpatient.
>
> –return appointment in six weeks, which will be 11/08/04. In the meantime, this MD will contact Dr. Winston Brown, with written permission given today by the patient, and coordinate the transfer of care. The patient is informed that neither of his medications is VA formulary, and after we clarify past history, further plans will be made. Also, before further plans are made with respect to medications and treatment, the patient has agreed to contact the evaluation clinic detoxification clinic to make plans for involvement and treatment for his alcohol dependence.

As mentioned above, Dr. Shelley Brown conducted the interview with Joe Ford partially with Barbara Ford in the room and partially with her out of the room. While Barbara Ford was out of the room, Dr. Shelley Brown elicited from Joe Ford the fact that he owned a gun. He stated that his wife did not know about the gun. Dr. Shelley Brown asked for permission to tell Barbara Ford about the gun, but Joe Ford refused permission and said that it was none of his wife's business. When Dr. Shelley Brown asked him what he intended to do with the gun, he stated, "I'm not going to hurt myself with it." Dr. Shelley Brown testified:

> He looked me right in the eye. He was facing me. He was emphatic. He was not dramatic. He said, "Well, I'm not going to kill myself with it."

Dr. Shelley Brown did not record the fact that Joe Ford had a gun in her initial record. She did, however, call Dr. Winston Brown several days later to discuss the case with him, including the fact that Joe Ford had a gun. After that telephone conference, Dr. Shelley Brown wrote that she had spoken with Dr. Winston Brown regarding Joe Ford's history and Dr. Winston Brown's impressions. She informed Dr. Winston Brown of the major developments during the diagnostic interview. She learned from Dr. Winston Brown that alcohol dependence had been a significant issue in treatment, and that Dr. Winston Brown had prescribed Methylin as "a last-ditch intervention" because Joe Ford was unable to function after a prior cardiac admission. She reported that Dr. Winston Brown stated, "He has responded somewhat to his current regime." Dr. Winston Brown told her that Joe Ford had avoided talking about his experiences in Vietnam and had denied specific symptoms but that, nevertheless, Dr. Winston Brown had strongly suspected combat-related post-traumatic stress disorder. Dr. Winston Brown stated that he had been more flexible than he ordinarily would be with respect to the continuing use of alcohol due to Joe Ford's poor medical prognosis, which apparently was a reference to Joe Ford's cardiac disease. Dr. Shelley Brown recorded:

> In my opinion, Mr Ford is at fairly high risk of self-harm in the future, given his multiple risk factors, his new involvement in the process of seeking disability and the necessarily related processing of stressors, and the recent purchase of a gun.
>
> Dr Winston Brown remains available for support for this patient.

Dr. Shelley Brown wrote that note on October 6, 2004. Joe Ford committed suicide the next day.

# IV.

Both sides called psychiatrists as expert witnesses at trial. Needless to say, the psychiatrists disagreed as to whether Dr. Shelley Brown's evaluation and treatment plan comported with the standard of care. The plaintiff's expert testified that Dr. Shelley Brown did not evaluate the risk of suicide adequately and did not respond appropriately to the red flags that were present. He testified that she did not attribute sufficient significance to the fact that Joe Ford had recently[2] bought a gun. The plaintiff's expert testified that Dr. Shelley Brown should have confiscated the gun or made arrangements to ensure that the gun was confiscated and that she should have taken more aggressive steps to hospitalize Joe Ford. Her testimony was that she had suggested to Joe Ford that he might be hospitalized, but he refused and stated that he would not go into the hospital. She did not recommend that he be hospitalized because she did not think that he was in imminent danger of suicide. The plaintiff's expert disagreed and testified that she should have recommended much more strongly than she did that Joe Ford be hospitalized. In contrast, the psychiatrist called by the defendant as an expert witness testified that Dr. Shelley Brown did a very comprehensive evaluation, gathered a great deal of information, assessed the information appropriately, and planned an appropriate course of treatment. He disagreed with the assessment that Dr. Shelley Brown underevaluated the risk of suicide.

The real issue is whether, with the exercise of the degree of skill and care ordinarily used by psychiatrists in Little Rock or similar communities, Dr. Shelley Brown should have realized that Joe

---

[2] Joe Ford had purchased the gun approximately eight months before his visit with Dr. Shelley Brown. Dr. Shelley Brown did not know how long he had owned the gun but wrote in her report that he had purchased it recently because he said that his wife did not know about the gun and because she thought that Dr. Winston Brown would have known about it if Joe Ford had possessed it for a long period of time.

12

Ford was in imminent danger of suicide. She recognized, as her records show, that he was at risk for suicide in the future, but she did not believe that he was in imminent danger. As she stated in her testimony, "Compared to a healthy, nontraumatized, sober individual, he did have an increased risk. In the future, meaning not today, not tomorrow, not imminent risk, but some time in the next several years if things didn't turn around."

From a review of all of the evidence, the Court does not believe that Dr. Shelley Brown should have realized that Joe Ford was in imminent danger of committing suicide. The primary purpose for his visit to Dr. Shelley Brown appears to have been to pursue VA disability benefits. He did not present himself to Dr. Shelley Brown as a result of a crisis in his psychiatric situation. Although he reported owning a gun, he also told Dr. Shelley Brown that he had no plans to commit suicide. He looked her "right in the eye" and stated emphatically but without drama that he was not going to kill himself. He was not in the midst of any kind of psychotic episode. He had never attempted suicide in the past. He had never been hospitalized as a result of an imminent danger of suicide. He had a longstanding relationship with a well-respected psychiatrist in Little Rock, and he had a plan for coping with any crises regarding suicide. He had his psychiatrist's office and home telephone numbers. He also was given telephone numbers at the VA where he could seek help if needed. He was pursuing plans for the future. He agreed to be admitted to the detoxification unit to address his alcoholism, which was a serious problem and which increased his risk of suicide. As the psychiatrist called as an expert for the defense stated, the fact that Joe Ford was not in imminent risk of committing suicide is confirmed by the fact that he did not commit suicide until ten days after his visit with Dr. Shelley Brown. The expert stated, "We have a hard enough time predicting suicide in twenty-four hours, certainly not in ten days. Any number of things can happen ten days after you

see somebody." It should be noted that Barbara Ford accompanied Joe Ford on the visit to Dr. Shelley Brown. Barbara Ford is a registered nurse with specialties in psychiatry. She did not, so far as the evidence shows, express concern that Joe Ford was in imminent danger of committing suicide. She did express concern about his abuse of alcohol and, as noted in the record during the interview, she issued an ultimatum concerning his drinking.

As mentioned above, Dr. Shelley Brown spoke with Dr. Winston Brown several days after her interview with Joe Ford and Barbara Ford. She told Dr. Winston Brown about the gun and learned from him what his impressions were of Joe Ford. There is no evidence that Dr. Winston Brown thought that Joe Ford was in imminent danger of committing suicide. Joe Ford had reported suicidal thoughts, but nothing in Dr. Winston Brown's records indicates that he had ever been in imminent danger of suicide. Only three days before Joe Ford saw Dr. Shelley Brown, he saw Dr. Winston Brown, and Dr. Winston Brown gave a good report about his mood and general condition. Dr. Winston Brown recorded that the plan was for Joe Ford to see him again "in late winter or early spring," which would have been six months later. Obviously, had there been an indication that Joe Ford was in imminent danger of committing suicide, Dr. Winston Brown would have planned to hospitalize him or to see him much sooner than three to six months later.

It should also be noted that after Dr. Shelley Brown saw Joe Ford, he was at home for ten days and, so far as the evidence shows, gave no sign of being in imminent danger of committing suicide. He did follow-up, as he had told Dr. Shelley Brown he would do, and made an appointment to enter the detoxification unit.

The purpose of the comments regarding Barbara Ford and Dr. Winston Brown is not to point any fingers at them or to blame them for Joe Ford's suicide. The Court does not believe that they

14

were negligent or in any way responsible for Joe Ford's suicide. The fact is, however, they had a much longer history with Joe Ford than did Dr. Shelley Brown. She saw him on only one occasion. They apparently did not believe that Joe Ford was in imminent danger of suicide, nor did she. She indeed gained a great deal of information from him, including the fact that he had a gun, which neither Barbara Ford nor Dr. Winston Brown had learned; but her conclusion that Joe Ford was not in imminent danger of committing suicide is consistent with the observations of Dr. Winston Brown and consistent with the silence of Barbara Ford about any crisis or imminent danger of suicide. No one involved with Joe Ford thought that he was in imminent danger of suicide.

The plaintiff has criticized Dr. Shelley Brown for not taking more aggressive steps to hospitalize Joe Ford. The Arkansas Code states the criteria for an involuntary admission as a result of a mental condition. Ark. Code Ann. § 20-47-207(c). A person can be involuntarily admitted only if "he or she poses a clear and present danger to himself or herself or others." *Id*. The proof of such a clear and convincing danger requires proof that the person has inflicted serious bodily injury and there is a reasonable probability that the conduct will be repeated; that the person has threatened to inflict serious bodily injury and there is a reasonable probability that the conduct will occur if admission is not ordered; that the person's behavior demonstrates that he or she so lacks the capacity to care for his or her own welfare that there is a reasonable probability of death, serious bodily injury, or serious physical or mental debilitation if admission is not ordered; or if there has been an attempt to inflict serious bodily injury, that there is a reasonable probability that the conduct will occur if admission is not ordered. Ark. Code Ann. § 20-47-207(c)(1)-(2). There was no evidence from which Dr. Shelley Brown could have pursued involuntary admission under this criteria.

15

Although the plaintiff's expert testified that Dr. Shelley Brown should have taken more aggressive steps to pursue a voluntary admission, he admitted that his testimony on that point was speculative. He testified:

> I mean, it's entirely possible that she didn't seem to be firm with him at all. If she had been firm with him, he might have gone in voluntarily, instead of just saying, we have the opportunity of a voluntary admission, instead of saying, I want you in the hospital until we can assess all of this and help you, and I must tell Mrs. Ford about this weapon so that she can sequester it or get it out of the house. I think he probably would have gone along with it. That's speculation. I don't know that.

As a court said in a remarkably similar case, the law "recognizes that the vagaries of human conduct, especially conduct leading to self-destruction, are so unpredictable as to warrant great caution in imposing liability on the care-giver in the event of a patient's suicide when not in the care-giver's actual physical custody." *Trapnell v. United States*, 926 F. Supp. 534, 536 (D. Md. 1996), *affirmed*, 131 F.3d 136 (4th Cir. 1997). In hindsight, of course, everyone involved in this case might have done something differently. "Hindsight is not the test of due care, and none of these parties had the requisite crystal ball." *Gowan v. United States*, 601 F. Supp. 1297, 1306 (D. Or. 1985).

No one knows what precipitated Joe Ford's decision to commit suicide on October 7, 2004. It might have been the fact that he was scheduled to enter the detoxification unit the next day, but that is only speculation. No one knows. No one knows whether his suicide was precipitated by something that occurred in his life or in his thoughts between the date of his visit with Dr. Shelley Brown and his decision to commit suicide ten days later. Would he have agreed to be admitted to the hospital on September 27, 2004, if Dr. Shelley Brown had urged him to do so forcefully? No one knows. Would he have committed suicide on October 7, 2004, had he been hospitalized on September 27, 2004? No one knows. Would he have surrendered his gun if Dr. Shelley Brown had

16

urged him to do so more forcefully? No one knows. Would he have committed suicide by some other means had his gun been confiscated? No one knows.

While these hypotheticals cannot be answered with any degree of confidence, what can be said, by a preponderance of the evidence, is that Dr. Shelley Brown carefully and comprehensively evaluated Joe Ford and then established a reasonable and appropriate plan of treatment. In doing so, she exercised the degree of skill and care exercised by psychiatrists practicing in Little Rock, Arkansas, or in similar communities. Even if it were determined that Dr. Shelley Brown should have pursued some course other than the one she pursued, it is pure speculation as to whether doing so would have prevented Joe Ford's suicide.

## CONCLUSION

For the reasons stated, the Court finds in favor of the United States. A judgment will be entered separately dismissing the plaintiff's complaint.

IT IS SO ORDERED this 15th day of March, 2010.

							_____
							J. LEON HOLMES
							UNITED STATES DISTRICT JUDGE